IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAUREEN G., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   No. 18 C 7423 |
| | ) |
| ANDREW M. SAUL, | )   Magistrate Judge Finnegan |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## ORDER

Plaintiff Maureen G. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record, the Court now grants the Commissioner's motion.

## BACKGROUND

Plaintiff applied for DIB on October 6, 2015, alleging disability since June 26, 2008 due to Crohn's disease, liver disease, and bipolar disorder. (R. 171, 196). She subsequently amended the alleged onset date to January 12, 2010. (R. 192). Born in July 1964, Plaintiff was 45 years old as of the amended alleged disability onset date, and 49 years old as of her December 31, 2013 date last insured ("DLI"), making her at all relevant times a younger individual. (R. 153, 182). She has a high school diploma and

worked for nearly 25 years as a dental assistant. (R. 31, 197). Plaintiff quit her job on June 26, 2008 because she was too sick from Crohn's disease. (R. 32, 196).

The Social Security Administration denied Plaintiff's applications initially on November 19, 2015, and again upon reconsideration on March 16, 2016. (R. 59-77). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Gregory Smith (the "ALJ") on September 7, 2017. (R. 24). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Cheryl R. Hoiseth. (R. 26-58). On December 11, 2017, the ALJ found that Plaintiff's Crohn's disease and bipolar disorder did not alone or in combination significantly limit her ability to perform basic work-related activities for 12 consecutive months at any time prior to her December 31, 2013 DLI. (R. 83). Since Plaintiff could not establish that she had any severe impairments during the relevant period, the ALJ concluded she was not disabled. (*Id.*). *See* 20 C.F.R. §§ 404.1509, 404.1520(c). The Appeals Council denied Plaintiff's request for review (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In support of her request for reversal or remand, Plaintiff argues that the ALJ erred in finding that she had no severe impairments at step two of the sequential analysis. For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence.

## **DISCUSSION**

**A.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act (the "SSA"). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

3

**B.     Five-Step Inquiry**

To recover disability benefits under the SSA, a claimant must establish that she is disabled within the meaning of the SSA.  *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016).  A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to law for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).  If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five.  *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

**C.     Analysis**

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in finding that her Crohn's disease and bipolar disorder are not severe impairments. "A severe impairment is an impairment or combination of impairments that 'significantly limits [one's] physical or mental ability to do basic work activities.'"  *Castile*, 617 F.3d at 926. "The Step 2 determination is 'a *de minimis* screening for groundless claims' intended

4

to exclude slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (quoting *Thomas v. Colvin*, 826 F.3d 953, (7th Cir. 2016)). "When evaluating the severity of an impairment, the ALJ assesses its functionally limiting effects by evaluating the objective medical evidence and the claimant's statements and other evidence regarding the intensity, persistence, and limiting effects of the symptoms." *Thomas*, 826 F.3d at 960 (citing SSR 96-3p, 1996 WL 374181, at *2 (July 2, 1996)).

### 1. Crohn's Disease

The ALJ determined that Plaintiff's Crohn's disease was not a severe impairment at any time from the January 12, 2010 alleged disability onset date through the December 31, 2013 DLI because the condition was "in remission and only flared when [Plaintiff] was noncompliant" with medication. (R. 85). The objective medical evidence supports this conclusion. Plaintiff was diagnosed with Crohn's disease in approximately 1995 and was able to work despite the condition for many years. (R. 287). She started treating with gastroenterologist Vincent Muscarello, M.D., on April 7, 2004 due to a bout of loose stools. (*Id.*). Plaintiff's bowel was "under relatively good control, with no abdominal pain, cramps, diarrhea or bleeding" at that time, and Dr. Muscarello suspected an issue with Plaintiff's medications, either her use of lithium for bipolar disorder or intermittent use of nonsteroidal anti-inflammatory drugs ("NSAID"s). (R. 287-88). Following a medication adjustment, Plaintiff was "doing very well," "doing fine," and "doing fantastic" from June through December 2004. (R. 297-99). By August 3, 2005, Plaintiff's Crohn's was "in reasonable remission." (R. 285). Plaintiff had additional flares in November 2006 and October 2008, but both times she improved within a month or two. (R. 290, 292, 293).

Notably, though the October 2008 flare did not begin until October 3, Plaintiff quit working three months earlier in June 2008, claiming she was too sick to continue. (R. 32, 196).

After Plaintiff's October 2008 flare, more than a year passed before she sought further treatment for her Crohn's disease. On January 12, 2010, the alleged disability onset date, Plaintiff returned to Dr. Muscarello due to a Crohn's flare in December 2009. (R. 301). Plaintiff reported that the flare started soon after she began using Naprosyn (an NSAID) for low back pain. By the time of the January 2010 visit, however, Plaintiff had stopped that medication and started using Rowasa enemas, and had "improved markedly, up to 75%." (*Id.*). In fact, Plaintiff's exam on January 12 was normal. (*Id.*). Dr. Muscarello counseled Plaintiff against further NSAID use as it can cause Crohn's patients to come out of remission, and scheduled her for a colonoscopy on January 25, 2010. (R. 301, 303). The test showed hemorrhoids and diffuse Crohn's colitis worse distally than proximally in the colon. (R. 304). Though a corresponding pathology report diagnosed moderately active inflammatory bowel disease (R. 404), Plaintiff did not require additional Crohn's-related treatment for another 3 years.

On January 29, 2013, Plaintiff saw Dr. Muscarello following a Crohn's flare in December 2012. She reported having "a bad last half of 2012" because she required extensive and expensive dental repair work and her husband lost his job. Plaintiff got depressed, stopped taking her Crohn's medication (Pentasa), and started drinking again. (R. 342). This led to a flare and a call to Dr. Muscarello's office. After Plaintiff restarted the Pentasa, she was feeling better with no further abdominal pain, cramps, bleeding, or urgency as of the January 29, 2013 appointment. (R. 342, 345). Dr. Muscarello suspected Plaintiff had early alcohol-induced hepatitis and recommended an ultrasound

6

(R. 342), but another year and a half passed before Plaintiff sought treatment again in August 2014.

Plaintiff bears the burden of demonstrating that her Crohn's disease was severe during the relevant period. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports her claims of disability."). The records show, however, that she experienced only two Crohn's flares between December 2009 and December 31, 2013. Both of those flares lasted less than two months and resolved once Plaintiff was medication compliant. Afterwards, Plaintiff was able to go years without further treatment. Plaintiff fails to explain how this evidence shows that her Crohn's was severe or disabling prior to her December 31, 2013 DLI. Notably, Plaintiff experienced similar short-lasting flares in April 2004, March 2005, November 2006 and October 2008, and she does not allege that she was disabled at those times. (R. 289, 290, 292, 293, 297).

Even after the DLI, Dr. Muscarello routinely found that Plaintiff's Crohn's disease was stable and in remission: no bleeding, abdominal pain, or other GI symptoms, and Crohn's "in remission colonoscopically" on September 16, 2014 (R. 383, 486); normal GI exam and Crohn's "in remission clinically" on October 21, 2014 (R. 379, 482-83); Crohn's "stable and in remission" with no bleeding, abdominal pain, or vomiting on December 16, 2014 (R. 377, 479); no abdominal pain or extraintestinal manifestation of Crohn's, which was "stable on Pentasa therapy" on March 18, 2015 (R. 375, 474); esophagogastroduodenoscopy showed erosive gastritis on May 1, 2015, but no bleeding, abdominal pain, or other GI symptoms such that Crohn's was deemed stable on June 17, 2015 (R. 373, 437, 439, 619-20); no bleeding, pain or any symptoms "referable to Crohn's

7

at this time," disease stable and in clinical remission on November 10, 2015 (R. 371, 614-15); Crohn's "stable and in remission" with no bleeding or extraintestinal irritable bowel disease manifestations on July 26, 2016 (R. 608-11); and Crohn's in remission with normal GI exam on March 29, 2017. (R. 604-06). *Compare Grisanzio v. Berryhill*, No. 16 C 50197, 2017 WL 6988660 (N.D. Ill. Dec. 18, 2017) (ALJ prematurely decided the case at step two of the analysis where the plaintiff's Chiari malformation caused severe monthly headaches requiring her to stay in bed for days to recover prior to the DLI, and records dated after the DLI showed the headaches increased to once per week and required surgical intervention).

Rather than address any of these records, Plaintiff focuses on her August 25, 2014 hospitalization for cirrhosis. (R. 443, 444). Brian J. Blumenstein, M.D., a partner of Dr. Muscarello, examined Plaintiff and indicated that she had "lost all medical followup for about a year-and-a-half" and had "really kind of deteriorated since that time." (R. 449). He diagnosed anemia, which appeared to be a chronic process, and cirrhosis, likely alcohol related and complicated by ascites (fluid in the abdomen caused by cirrhosis) and GI bleeding. (*Id.*). At the time of Plaintiff's discharge on August 28, 2014, doctors had added portal hypertension (an increase in blood pressure within a system of veins leading to the liver), history of depression, and hypokalemia (low blood potassium) to her list of impairments. (R. 386). The ALJ discussed these records but correctly noted that Plaintiff did not receive any diagnosis or treatment related to a liver impairment during the relevant period. (R. 85). Plaintiff does not challenge this aspect of the ALJ's ruling or identify any disabling symptoms attributable to her liver conditions arising prior to the DLI on

8

December 31, 2013. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments . . . are waived.").

Plaintiff does try to tie her anemia to her 2012 dental work, noting that on May 1, 2015, Dr. Blumenstein remarked that dental problems and bleeding in the gums may have contributed to Plaintiff's progressive anemia. (Doc. 19, at 7; R. 439). There is no evidence, however, that the anemia was severe or caused disabling symptoms prior to December 31, 2013. And as noted, all of Plaintiff's exams after the August 2014 hospitalization were normal aside from some low level jaundice and mild anemia. (R. 377, "mildly anemic" on December 16, 2014; R. 383, "low level jaundice" on September 16, 2014).

Plaintiff argues the ALJ still erred by giving little weight to Dr. Muscarello's May 1, 2017 opinion that she has significant limitations as a result of her Crohn's disease, cirrhosis and depression. (R. 598-602). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(c)(2); *see Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as he provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of

9

examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6); *see Simila*, 573 F.3d at 515.

Dr. Muscarello completed a Crohn's & Colitis Residual Functional Capacity Questionnaire on May 1, 2017 opining that Plaintiff can walk 1/2 block before needing to rest, sit for 2 hours before needing to stand or walk, and stand for 1 hour before needing to sit. All told, Plaintiff can sit for a total of 4 hours and stand for about 2 hours in an 8-hour workday, and she needs to shift positions at will. (R. 600). Dr. Muscarello indicated that Plaintiff needs ready access to a restroom and will take unscheduled bathroom breaks 1-3 times per day, lasting 15-20 minutes, maybe with little warning. She can occasionally carry less than 10 pounds; rarely carry 10 pounds; occasionally twist, stoop, crouch, and climb stairs; and never climb ladders. (R. 601). Plaintiff is likely to have good days and bad days, and to be absent from work about 3 days per month. (R. 602).

In assigning this opinion little weight, the ALJ explained that it conflicts with the record evidence showing Plaintiff's Crohn's disease was controlled as long as she complied with medication. (R. 87). Plaintiff disputes this assessment but fails to acknowledge that her two brief flares in four years (between December 2009 and December 31, 2013), came on the heels of NSAID use and failure to take Pentasa. Both flares resolved quickly once Plaintiff was medication compliant, and required only 3 visits to Dr. Muscarello in 4 years. Plaintiff also ignores the numerous records from 2014 forward documenting normal exams and stating that her Crohn's was in remission, which

directly contradicts Dr. Muscarello's findings of severe limitations. To the extent Dr. Muscarello believed Plaintiff's functional restrictions stemmed from cirrhosis, the ALJ correctly observed that this condition was first diagnosed in August 2014, well after the December 31, 2013 DLI. (R. 87). And as noted, Plaintiff does not claim to have suffered any specific cirrhosis-related limitations prior to the DLI.

Plaintiff finds it significant that Dr. Muscarello endorsed an emotional component to her illness, namely, that depression "led to prior alcoholism." (R. 599). As discussed in greater detail below, Plaintiff's psychiatrist routinely described her as "well" and "stable" from at least September 2008 through April 2017, with no mention of depression, alcoholism or any other mental concerns. (R. 534-37, 538-40, 541, 544, 545, 550-51, 563, 564, 565, 584-88). Moreover, Plaintiff's self-report of depression to Dr. Muscarello in January 2013 does not alter the medical records showing she recovered quickly from her December 2012 flare and did not seek further treatment for a year and a half. (R. 342).

Contrary to Plaintiff's assertion, the ALJ was not required to recontact Dr. Muscarello for additional evidence regarding his opinion. "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, Dr. Muscarello's own treatment notes show Plaintiff's Crohn's was under control with medication through early 2013 despite a few brief flares, and has been in remission since September 2014 with normal GI exams. *Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018) (ALJ was not required to recontact a physician where "the record contained adequate information for the ALJ to render a decision."). Given the inconsistency

11

between the evidence and Dr. Muscarello's opinion, the ALJ reasonably discounted his findings and instead afforded great weight to the opinions from State agency reviewers that Plaintiff's Crohn's was not severe or disabling prior to her DLI. (R. 62, 72, 87). Plaintiff does not address the weight given to the State agency opinions or argue that the ALJ committed any specific error related to that determination.

All that remains are Plaintiff's subjective statements regarding the limiting effects of her Crohn's symptoms, and the statements from her husband. The regulations describe a two-step process for evaluating a claimant's own description of her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2. If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id*. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, h[is] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). An ALJ's assessment of a claimant's subjective complaints will be reversed only if "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). In evaluating statements from "other sources" such as a spouse, the ALJ should consider "such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other facts that tend to support or refute the evidence." *Pogatetz v. Colvin*, No.

12 C 4060, 2013 WL 6687940, at *14 (N.D. Ill. Dec. 17, 2013) (quoting SSR 06-03p, 2006 WL 2263437).

Plaintiff testified that she stopped working as a dental assistant in October 2008 because she was too sick from Crohn's disease and irritable bowel syndrome. (R. 32). Before she quit, she used Imodium, kept changes of clothes with her, and went home "plenty of times" – probably once per week. (R. 32-33). She also wore adult diapers and was having 20 accidents per month. (R. 33). Plaintiff estimated that she has a flare-up every other month lasting five or six days. (R. 34). She experiences a lot of pain and cramping and takes Pentasa and Rowasa enemas. (R. 35). In an October 22, 2015 Function Report, Plaintiff stated she suffers from severe stomach cramps on a daily basis, has diarrhea with blood, is nauseous from her iron pills, and is always tired. (R. 217). Plaintiff is able to do laundry and light housekeeping with help from her husband, and she grocery shops a few times a week for about half an hour. (R. 219-20). Many days, however, she just stays in bed. (R. 218).

The ALJ determined that Plaintiff's complaints were not consistent with the medical records showing only two brief Crohn's flares from December 2009 to August 2014, followed by years without the need for further treatment. (R. 84-85). There is no evidence that Plaintiff ever complained to Dr. Muscarello about accidents or use of adult diapers. Nor did she mention having flares aside from the ones prompting her to seek treatment in April 2004, March 2005, November 2006, October 2008, December 2009, and December 2013, far less frequently than every other month. Once Plaintiff's flares subsided, moreover, she routinely told Dr. Muscarello that she was "doing fine," "doing well," and no longer had abdominal cramps, pain, bleeding, or urgency. Consistent with

13

that report, Plaintiff's exams were normal and unremarkable, and she never complained of difficulties performing daily activities. (R. 291, 292, 301, 343). Plaintiff does not address any of this evidence or explain how it supports her statements regarding disabling Crohn's symptoms prior to the December 31, 2013 DLI. Nor does she explain how she was able to go years without treatment if she really had accidents 20 times a month and severe stomach cramps on a daily basis as she claims. *See Jones*, 623 F.3d at 1161 ("[Discrepancies between the objective evidence and self-reports may suggest symptom exaggeration.").

In her reply brief, Plaintiff notes that her husband lost his insurance in 2012, which led her to stop taking Pentasa and have the flare in December 2012. (R. 342; Doc. 28, at 3). The ALJ acknowledged this event (R. 85), but also observed that Plaintiff restarted Pentasa at least by January 2013 and raised no other concerns about cost. In addition, Plaintiff does not claim she lacked insurance to see a physician during the two and a half year period between January 2010 and mid-2012, yet there are no records of any Crohn's-related treatment. On the record presented, the ALJ's decision to discount Plaintiff's testimony regarding the severity of her Crohn's disease was not patently wrong.

For similar reasons, the ALJ reasonably gave little weight to statements from Plaintiff's husband. He completed a Third-Party Function Report on October 20, 2015 stating that Plaintiff suffers from diarrhea, severe abdominal pain, cramping, fatigue, weakness, loss of appetite, and dehydration as a result of her Crohn's disease and liver failure. (R. 206). There are times when she does not get out of bed for days. (R. 207). Plaintiff is able to do some light cleaning and laundry with help from her husband. (R. 208). She goes shopping for groceries a few times a month but can only walk a block or

14

so before needing to rest for a few minutes. (R. 209, 211). As with Plaintiff's testimony, the ALJ concluded that the husband's statements find no support in the record and are contradicted by evidence showing Plaintiff's Crohn's was controlled with medication and/or in remission. (R. 87). The Court finds no error in this assessment.

Viewing the record as a whole, the ALJ reasonably concluded that Plaintiff's Crohn's disease was not a severe impairment at any time prior to the December 31, 2013 DLI because it did not significantly limit her ability to work. (R. 85). Plaintiff's request to remand the case for further consideration of this issue is denied.

### 2. Bipolar Disorder

Plaintiff argues that the case must still be remanded because the ALJ should have found her bipolar disorder to be a severe impairment. As with Plaintiff's Crohn's disease, her medical records do not support this claim. Plaintiff first started treating with psychiatrist Sudhir M. Gokhale, M.D., on June 12, 2008, a year and a half before the January 12, 2010 alleged disability onset date. The handwritten notes are difficult to read, but Plaintiff mentioned joining AA and having Crohn's disease. (R. 571-73). Plaintiff was doing well on September 9, 2008, November 21, 2008, and April 3, 2009. (R. 573-74, 588). In June 2009, Plaintiff reported no new problems and no medication side effects. Her home situation, sleep, and appetite were all good, and Dr. Gokhale deemed her stable. (R. 568). Plaintiff complained of some anxiety on March 5, 2010 (shortly after the January 12, 2010 alleged disability onset date), but all subsequent treatment notes reflect that Plaintiff was doing well on her medications with no complaints. (R. 541, 544-45, 563-66). In fact, Dr. Gokhale stated that Plaintiff's bipolar disorder was in full remission as of

15

October 26, 2013 (R. 541), and he repeated that assessment 14 times through April 2017. (R. 534-40, 550-51, 584-88).

Based in part on these records, the ALJ gave great weight to the opinions from the State agency reviewers who determined that Plaintiff's bipolar disorder was not a severe impairment prior to her DLI. (R. 63-64, 73-74, 87). Specifically, the ALJ adopted the reviewers' findings that Plaintiff had no limitation in understanding, remembering, or applying information; mild limitation in interacting with others; mild limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing oneself. (R. 63, 73, 86). *See* 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe."). The ALJ also cited to Plaintiff's October 22, 2015 Function Report indicating that she can pay bills, follow written and spoken instructions, remember to go places and take her medication without reminders, talk on the phone and visit with family and friends, get along well with authority figures, watch television, handle her personal care (except for difficulty dressing due to join pain), drive and shop without reminders, and do laundry and light cleaning. (R. 86, 218-22).

Plaintiff argues that the ALJ should have given great weight to an April 26, 2017 opinion from Dr. Gokhale. In a Depressive, Bipolar and Related Disorders Professional Source Data Sheet completed at the request of Plaintiff's counsel, Dr. Gokhale opined that Plaintiff is markedly limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 597). In all other

16

areas of functioning, including understanding and memory, sustained concentration and persistence, social interaction, and adaptation, Plaintiff is moderately limited. (*Id.*).

The ALJ gave Dr. Gokhale's opinion little weight because it is not supported by his own treatment notes consistently showing that Plaintiff was doing well and that her symptoms were controlled with medication. (R. 87). Though Dr. Gokhale stated that Plaintiff suffers from a depressed mood, diminished interest, appetite disturbance, sleep disturbance, decreased energy, psychomotor agitation or retardation, feelings of guilt or worthlessness, pressured speech, flight of ideas, inflated self-esteem, decreased need for sleep, and distractibility (R. 592-93), he did not document any of those symptoms in his records during the more than 8 years that he treated her. (*See* R. 567, Plaintiff doing well on September 11, 2009; R. 566, no problems noted on June 11, 2010, and Plaintiff doing well overall following a good summer on September 11, 2010; R. 565, Plaintiff loved Thanksgiving in November 2010; R. 564, Plaintiff doing well and stable on her medications in January 2011; R. 565, Plaintiff doing well on her medications on March 14, 2011; R. 564, Plaintiff doing well on September 15, 2011; R. 563, Plaintiff doing great on medications and stable with no complaints on March 6, 2012; R. 545, Plaintiff appropriate and stable, everything going well on August 14, 2012; R. 545, no problems indicated on February 12, 2013; R. 544, Plaintiff doing well on May 9 and August 6, 2013; R. 541, Plaintiff doing well, medications are working, family is good, and bipolar in full remission on October 26, 2013; R. 540, Plaintiff doing well, had good holidays, bipolar in full remission on January 24, 2014; R. 534, 535, 538, bipolar in full remission, Plaintiff doing well, no medication side effects, no agitation on April 29, July 22, and October 14, 2014; R. 534, bipolar in full remission, no medication side effects on February 5, 2015;

17

and R. 536-37, 550-51, 584-88, Plaintiff doing well and bipolar in remission on April 23, 2015, July 29, 2015, October 20, 2015, January 20, 2016, April 13, 2016, July 13, 2016, October 20, 2016, January 10, 2017, and April 4, 2017). In light of these extensive and clear records, there was no reason for the ALJ to recontact Dr. Gokhale for further information. *Britt*, 889 F.3d at 427.

Tellingly, Plaintiff does not address these records from Dr. Gokhale but instead observes generally that "a person can have a condition that is both 'stable' and disabling at the same time." (Doc. 19, at 11) (quoting *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008)). She also stresses that "the very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." (Doc. 28, at 2) (quoting *Scott*, 647 F.3d at 740). The flaw in Plaintiff's argument is that she does not point to a single record indicating that she experienced any problems or limitations related to bipolar disorder during the relevant period or beyond. *Compare Punzio*, 630 F.3d at 710 (ALJ erred in rejecting treating psychiatrist's opinion where her treatment records showed the plaintiff routinely exhibited mental deficits despite some more positive assessments at certain visits). In such circumstances, the ALJ cannot be said to have "cherry-picked" evidence, as Plaintiff suggests. (Doc. 19, at 10).

Also unavailing is Plaintiff's assertion that the ALJ erred by failing to subpoena records from Zenaida L. Vivar, M.D., the psychiatrist who treated Plaintiff from approximately 2005 until she started seeing Dr. Gokhale in June 2008. (R. 45; Doc. 19, at 10; Doc. 28, at 2). Plaintiff notes that she attempted to obtain the records herself but

18

Dr. Vivar would not release them to her. (R. 46). Subpoenas are appropriate when "'reasonably necessary for the full presentation of a case.'" *Williams v. Colvin*, No. 14 C 5075, 2015 WL 5227736, at *3 (N.D. Ill. Sept. 4, 2015) (quoting *Butera v. Apfel*, 173 F.3d 1049, 1057 (7th Cir. 1999)). "The party requesting the subpoena must 'state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena.'" *Ellsworth v. Berryhill*, No. 15 C 10268, 2017 WL 3978188, at *5 (N.D. Ill. Sept. 11, 2017) (quoting *Butera*, 173 F.3d at 1057).

Here, there is no evidence that Plaintiff, who was represented by counsel, ever requested that the ALJ subpoena records from Dr. Vivar. Moreover, Dr. Vivar did not see Plaintiff for a year and a half prior to the January 12, 2010 alleged disability onset date, and the ALJ had access to all of Dr. Gokhale's records covering the relevant period and beyond (June 2008 through March 2017). It is thus not at all clear why the missing records have any bearing on the ALJ's decision, and Plaintiff does not provide any specific analysis in that regard. Plaintiff's related argument concerning a subpoena for her hospital records is similarly unpersuasive. Plaintiff testified that she was hospitalized in 2006 at Palos Heights Hospital and in 2010 at Christ Hospital. (R. 45-46). Again, Plaintiff does not claim that she asked the ALJ to subpoena those records. Nor has she provided any details regarding those hospitalizations, or explained how the records are important to proving her case. Notably, Plaintiff testified that she probably had the hospital records in her possession at one time but "didn't think that [the ALJ] wanted them." (R. 47). And regardless of what may appear in the hospital records, the records from Dr. Gokhale throughout 2010 and afterwards all show that Plaintiff was doing well with no complaints.

19

Once again, Plaintiff is left with subjective statements regarding her symptoms. In her October 22, 2015 Function Report, Plaintiff stated that she does not deal with stress or handle changes in routine well, and she suffers from anxiety attacks, fear of crowded places, and depression. (R. 223). Plaintiff's husband made similar claims about his wife in his October 20, 2015 Third-Party Function Report. (R. 212). The ALJ reasonably discounted these statements because they are inconsistent with medical records repeatedly showing that Plaintiff's bipolar symptoms were controlled with medication, and that the condition was in remission from October 2013 onward. (R. 84, 86). As the ALJ noted, Plaintiff never had any abnormal mental exams, required minimal treatment, and engaged in a variety of daily activities that undermined her claims of disabling symptoms. (R. 86). *See Jones*, 623 F.3d at 1161.

Viewing the record as a whole, the ALJ's determination that Plaintiff's bipolar disorder was not a severe impairment at any time prior to the December 31, 2013 DLI is supported by substantial evidence. Plaintiff's request that the case be remanded for further consideration of this issue is denied.

## CONCLUSION

For the reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied, and the Commissioner's motion for summary judgment [23] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: May 26, 2020

SHEILA FINNEGAN
United States Magistrate Judge